## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MICHAEL SEVERE, | |
| Plaintiff, | |
| v. | Civil Action No.:  SAG-20-3404 |
| USA,<br>TIMOTHY STEWART,<br>ASST. WARDEN SAMPLE,<br>UNIT MANAGER HOLLER,<br>DOE,<br>MOHAMED MOUBAREK,<br>KRISTI CRITES,<br>J. YOON,<br>F. KHORASHAD,<br>DR. HAHN, | |
| Defendants. | |

## MEMORANDUM

In response to this complaint which was filed pursuant to the Federal Tort Claims Act ("FTCA") and *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), defendants filed a motion to dismiss or for summary judgment.  ECF 26.  Plaintiff Michael Severe, who proceeds *pro se*, opposes the motion (ECF 38), moves for appointment of counsel (ECF 25, 29, 31, and 32), and for an extension of time to obtain a certificate of merit (ECF 44). No hearing is necessary to resolve the matters pending before the court.  *See* Local Rule 105.6 (D. Md. 2021).  For the reasons that follow, defendants' motion shall be granted in part and denied in part, plaintiff's various motions to appoint counsel shall be granted, and his motion for extension of time shall be denied as moot.  Additionally, the case will be stayed pending plaintiff's arrival back in the Mid-Atlantic region.[1]

---

[1]    With less than 18 months left on his sentence, plaintiff was transferred from FCI-Cumberland to a Federal Detention Center in Houston, Texas.  Plaintiff was convicted and sentenced where he resided in West Virginia.

## I.      Background

Plaintiff Michael Severe alleges that in September 2018, he was assigned to a cell (Cell 215) at FCI-Cumberland that did not have a ladder to reach the top bunk where he slept.   ECF 1 at 9.  He states he "had to routinely jump up and down" off and on the top bunk.  *Id*.  When Severe spoke to Unit Manager David Holler about providing him with a ladder to access the top bunk, Holler denied his request and advised him to use a chair to get up and down.  *Id*.

Severe maintains that defendants' security explanation for not providing a ladder is essentially a farce.  Severe claims that "most all the cells had ladders."  ECF 38 at 7.  He states that hiding behind the bars of the ladder as defendants claim is not feasible and inmates can more easily hide behind the cell door.  *Id*.  He further states that the idea that the ladders could be used to make weapons is also not a legitimate reason for denying him a ladder as there are numerous items available through the commissary and otherwise that can more easily be used as weapons (e.g., steel scissors, steel locks, metal from UNICOR shops, broomsticks, and mop handles).  *Id*.

Severe recalls that on September 11, 2018, he had awakened at 2:00 a.m. to urinate.  ECF 38 at 6.  He states his cellmate had blocked the window and the door with a sheet so there was no light in the cell, only "a tiny crack for the [correctional officer] to look in during rounds."  *Id*. at 7.  While trying to navigate finding the chair with his foot, balancing on one leg and holding onto the bed, the chair slipped out from beneath one foot just as he had let go of the bed with his hand, causing him to fall.  *Id*.  He landed in a "split," and recalls feeling pain immediately in his knees and in his right hip.  *Id*.  Severe's cellmate called for help, but the officer on duty said that there was nobody at the medical unit who could help with this type of injury.  *Id*.  The following morning, Severe "limped and struggled to the medical department."  *Id*.

---

Plaintiff has advised the court that he is going to be released on September 29, 2021 and upon his release will reside in Pennsylvania.  ECF 44.

Upon arrival to the medical department, Severe was evaluated by CRNP Kristi Crites. Severe states that Crites ordered an x-ray, gave him a wheelchair for three-days, and prescribed pain medication. ECF 1 at 10. The x-ray results came back on September 14, 2018 and Crites informed Severe that "nothing was wrong with his hip or knee and ordered that [he] should exercise and work the pain out." *Id*. at 11.

Severe believes that Crites's recommendation derived from Dr. Mohamed Moubarek's review of the x-ray, which reflected that it did not show a fracture or malalignment. ECF 1 at 11. Severe claims that Dr. Moubarek saw "some signs of injury but brushed it off as an old injury." *Id*. Despite Severe advising Crites that he "fell hard off of the top-bunk trying to get down," he claims Dr. Moubarek did no further evaluation of his injury. *Id*. Severe was advised to return in four months if he still felt pain in his hip or knee. *Id*.

On October 9, 2018, Severe reported to Crites that his pain had increased to the point he could not walk to the dining hall to receive meals without being in extreme pain. ECF 1 at 12. Severe told Crites he had lost 30 pounds because of his inability to reach the dining hall. *Id*. He explained to her that he believed the pain was caused by the fall from his bunk, but Crites disagreed and diagnosed him with muscle strain. *Id*. Severe was given pain medication and advised to "stretch out the injury." *Id*. at 13. He claims his complaints went ignored by Crites, Moubarek, Thomas Gera and "any and all medical employees at FCI Cumberland" following the October encounter. *Id*.

In early February 2019, Severe recalls he "limped to the FCI Cumberland chow hall" to look for a medical provider. ECF 1 at 13. When he saw Ms. Hamilton, an administrator in the "medical department," he complained to her about the pain in his leg, groin, and hip. *Id*. Hamilton assured Severe that she would check to find out why he wasn't being seen for the problem. *Id*. Following his conversation with Hamilton, Crites told him she had paged him over the prison's

3

intercom system for a medical visit, but he never showed up.  *Id.*  Severe maintains he never heard the call and maintains such a call is not the proper procedure for summoning someone to a medical evaluation under applicable regulations.  *Id.* at 14.

On February 11, 2019, Severe was seen again by Crites and he again complained about extreme pain in his hip and knee, limiting his ability to walk.  ECF 1 at 14.  Crites told Severe to obtain pain medication from the prison commissary and ordered another x-ray.  *Id.*  Two days later, the x-ray was performed.  *Id.*

On February 19, 2019, Crites simply told Severe that she would continue to monitor his condition and repeat an x-ray of his hip in three to four months.  ECF 1 at 14.  Severe claims he was never given the results of the x-ray, but also claims that Moubarek reviewed the x-rays and changed his report twice to cover-up the findings.  *Id.* at 15.  Severe states that the report indicated "'a mild increased sclerosis appearance in the left femoral head and on the AP projection there is a subtle step-off appearance of the superior lateral femoral head articular contour.  These raise some suspicion for possible early avascular necrosis changes.'"  *Id.*

On April 24, 2019, a lieutenant sent Severe to the medical department after noticing him limping and in pain.  ECF 1 at 15.  C. Todd, RN examined Severe and ordered ibuprofen to be dispensed to him in the evening pill line.  *Id.*  Todd told Severe that he would notify his primary care provider about the pain he was experiencing.  *Id.*

On April 29, 2019, Crites examined Severe for his complaints of extreme pain that caused difficulties in walking to the chow hall to eat meals.  ECF 1 at 16.  At this time, Severe told Crites he wanted an MRI since they were telling him the x-rays did not show an injury.  *Id.*  His request was denied, but he was scheduled for another x-ray.  *Id.*  Severe claims he was not prescribed any pain medication but was advised to obtain over the counter medication at the prison commissary.  *Id.*

The x-ray results were received on June 14, 2019; Severe claims Crites simply signed the radiology form. ECF 1 at 16. Later that month, Severe was informed that he needed "some sort of hip replacement surgery." *Id.* Severe states that this assessment occurred after Moubarek and Crites told him a number of times that there was nothing wrong with his knee or hip. *Id.* Severe believes that the issues with his hip occurred as a result of his fall from the top bunk. *Id.* at 17. Severe has avascular necrosis in his right hip with a "subchondral collapse involving the weight bearing portion of the femoral head." *Id.* He states his hip is still not repaired and a surgical procedure to release pressure from the area has not resolved the problem. *Id.* According to Severe, Moubarek would not "sign off" on a total hip replacement to treat his right hip. *Id.*

Severe raises a claim under the Federal Tort Claims Act ("FTCA") and asserts his Eighth Amendment rights were violated when defendants Stewart, Sample, Holler, and Doe failed to implement a policy or practice of installing ladders in the cells at FCI Cumberland. ECF 1 at 17-20. He also claims that defendants Moubarek, Crites, Yoon, Khorashadi, and Hahn[2] violated his Eighth Amendment rights when they denied him access to medical care for a serious medical need and implemented an unsound policy or practice of delaying medical care for his serious medical problems. *Id.* at 20-22.

Dr. Mohamed Moubarek provides a declaration in support of defendants' pending motion for summary judgment. ECF 26-3. Moubarek is the clinical director at FCI Cumberland and functions as the primary physician for inmate medical services. *Id.* at 2. Moubarek states that he supervised the clinicians who provided Severe with medical care while he was assigned to FCI Cumberland between August 27, 2018 and December 14, 2020. *Id.* at 3. He explains that Severe

---

[2]     Yoon, Khorashad, and Hahn could not be identified and were not served. ECF 12 and 13.

as initially evaluated when he arrived to FCI Cumberland and was given a bottom bunk pass due to his history of seizures. *Id.*

Severe does not dispute that he had a bottom bunk pass but explains that Mr. Washington did not care about the pass and assigned Severe to a cell with an older man who had bad knees. ECF 38 at 6. When Severe told Washington that he needed a bottom bunk, he claims Washington told him to "make the old man move up top then." *Id.* When Severe approached his cellmate with this suggestion, he recalls his cellmate telling him that he had been in that bunk for almost 15 years and was too old to jump up and down to and from the top bunk. *Id.* Severe explains that he could tell that the bunk assignment issue was going to cause trouble no matter where he was housed. *Id.* After Severe noticed there were empty cells, and in the interest of not causing a fight, Severe asked Washington if he could be moved to one of those cells so he could use the bottom bunk. *Id.* Washington denied the request explaining that those cells were reserved for "hardworking orderlys [sic]." *Id.* Further efforts to resolve the situation through Washington or Holler were unsuccessful. *Id.* Ultimately, Severe resolved the issue by moving to a cell with an inmate who was going to be released soon, which meant Severe could move to the bottom bunk when his cellmate left. *Id.*

Moubarek explains that Severe was seen by Crites on September 11, 2018, following his fall from the top bunk. ECF 26-3 at 3. The Clinical Encounter note indicates that Severe reported that his "right upper leg was already hurting" when he arrived at FCI Cumberland. ECF 27 at 163. The x-ray ordered by Crites showed a "very minor calcification near the top of his femur bone, which may represent mild inflammation or remnants of an old injury." ECF 26-3 at 4; ECF 27 at 194. Severe was informed of the results on September 13, 2018 and was advised to purchase ibuprofen from the commissary if needed. ECF 26-3 at 4.

On October 9, 2018, Crites saw Severe again for complaints of pain in his upper right leg. Severe advised that he did not have funds to purchase pain medication, therefore Crites provided

him with a two-week supply of ibuprofen and advised him to use moist heat on his leg and to do stretches.  ECF 26-3 at 4.

On January 11, 2019, Crites saw Severe for a follow-up visit regarding his seizures; he did not complain of leg pain.  ECF 26-3 at 4.

On February 1, 2019, Severe was scheduled for an evaluation of his leg pain, but according to Moubarek he did not show up.  ECF 26-3 at 4.  On February 11, 2019, Severe reported to sick call and complained that his right leg hurt when it was outstretched and advised that he was voluntarily sleeping on the top bunk because he wanted to stay with his current cellmate.[3]  *Id*. Evaluation of Severe's leg revealed that he did not have any "muscle wasting" and still had normal range of motion but certain movements were painful.  *Id*.  The examiner told Severe to use over the counter pain relievers and ordered repeat x-rays.  *Id*. at 4-5.

An x-ray taken on February 13, 2019 revealed "mild increased sclerosis (hardening) in the femoral neck" in comparison to the September 12, 2018 x-ray.  ECF 26-3 at 5; ECF 27 at 198-99. The change in images raised a suspicion of early avascular necrosis; Moubarek explains that this means the top of Severe's femur "could have reduced or interrupted blood supply."  ECF 26-3 at 5; ECF 27 at 129.  Due to that concern, another x-ray was planned in three months.  ECF 26-3 at 5; ECF 27 at 131.  The treatment plan established included analgesic medications, a cane, and "surveillance of the condition."  *Id*.

On April 24, 2019, Severe reported to sick call for evaluation of his right leg.  Though Severe was walking with a slight limp, his leg exhibited no redness, swelling, bruising or any indication of a patellar tendon rupture.  ECF 26-3 at 5.  The examiner gave him a three-day supply of ibuprofen and told him to return if the pain worsened.  *Id*.

---

[3]         Severe disputes that this was the reason he remained in a cell where he had to use the top bunk.  ECF 38 at 6.

On April 29, 2019, Severe reported to sick call complaining of right leg pain and he was prescribed Meloxicam, a non-steroidal anti-inflammatory drug. ECF 26-3 at 5. Severe refused the offer of a cane. *Id*.; *see also* ECF 27 at 112, 114. Severe describes this encounter differently. He maintains that he arrived at sick call in a wheelchair he borrowed from another inmate and Crites took it away from him, in apparent disbelief that he was suffering enough pain to require a wheelchair. ECF 38 at 10. When Crites offered him a cane, he refused it because he was upset at the time but returned later to retrieve it. *Id*.

Meanwhile, Moubarek discussed Severe's potential avascular necrosis with Dr. Hahn, an orthopedist. ECF 26-3 at 5. The purpose of Mourbarek's consultation with Dr. Hahn was to "see the degree of avascular necrosis to determine if steroid injections are necessary." ECF 27 at 110. Moubarek recalls that Dr. Hahn advised him that x-ray imaging would be sufficient to visualize whether Severe had avascular necrosis, therefore Moubarek sent the x-ray images to Hahn for his review. ECF 26-3 at 5; ECF 27 at 110.

On June 12, 2019, another x-ray of Severe's right hip showed right femoral head avascular necrosis. ECF 26-3 at 6. Moubarek explains that "[a]vascular necrosis is a condition that occurs when blood flow to a bone is interrupted or permanently reduced, causing bone tissue to die." *Id*. Specifically, the radiology report states that "[a]s before, there is abnormal sclerosis of the femoral head, compatible with avascular necrosis" and notes that there is a "2mm step-off . . . on the weightbearing portion of the femoral head consistent with subchondral collapse." ECF 27 at 204.

On June 24, 2019, Severe learned that Health Services had referred him to an orthopedist after Hahn's review of his x-ray. ECF 26-3 at 6, *see also* ECF 27 at 98-99. Although Hahn had received the x-rays of Severe's hip two months prior, it was not until this encounter in June that Severe learned that the condition of his hip was "too severe for an injection." ECF 27 at 99. Hahn opined that Severe would need "some sort of hip replacement surgery." *Id.* An x-ray of Severe's

right knee on July 3, 2019 showed no injury despite his continued complaints of pain.  ECF 26-3 at 6.

On July 29, 2019, Dr. Berkenblit, an orthopedist, examined Severe and recommended an MRI of his right hip.  ECF 26-3 at 6.  The August 23, 2019 MRI revealed "bilateral femoral head avascular necrosis in both hips, but the right worse than the left and with some flattening at the superior aspect (top) of the right femoral head."  *Id*.  The imaging report specifically states: "There are again noted changes of bilateral femoral head avascular necrosis."  ECF 27 at 213.  An MRI of Severe's right knee showed "some edema along the MCL and suspicious for strain" but was "otherwise unremarkable."  ECF 27 at 215-16.

Dr. Berkenblit examined Severe again on November 4, 2019 and recommended right femoral decompression surgery to help relieve Severe's pain.  ECF 26-3 at 7; ECF 27 at 217-18.  Additionally, Dr. Berkenblit's diagnoses for Severe included "drug induced osteonecrosis of right femur."  *Id*. at 217.

On February 10, 2020, Severe received right femoral decompression surgery.  ECF 26-3 at 7.  Dr. Berkenblit's pre-operative report notes that: "The patient understands that there is no guarantee that this procedure would provide significant relief, but given his radiographic findings of relatively early stage osteonecrosis and the fact that it is a minimally invasive outpatient procedure, the plan was to proceed rather than going directly to arthroplasty type procedure in this young patient."  ECF 27 at 221.  Following the surgery, Dr. Berkenblit prescribed "oxycodone/acetaminophen 5mg/325mg tablets for 3 days, acetaminophen/codeine 300/30mg for 3 days (to use after oxycodone tablets), and Ibuprofen 600mg for 14 days (to start after codeine prescription)."  ECF 26-3 at 7.  When Severe complained about stabbing hip and groin pain the day after his surgery, he was provided a wheelchair for long distance use and "was advised to use

a cane to get around in unit." *Id.*  Ultimately the decompression surgery failed to achieve a reduction in Severe's pain. *Id.*

According to Severe, the decompression surgery made the pain worse and, despite instructions by Dr. Berkenblit to return in three weeks for a total hip replacement if there was no improvement, no follow up was done.  ECF 38 at 13.  Severe claims that it was not until he filed a grievance that he received an x-ray six-months later that confirmed his suspicions that the necrosis had progressed. *Id.*

In February, 2020, Dr. Birkenblit recommended physical therapy for Severe and a "consult" was written.  ECF 26-3 at 7; ECF 27 at 231.  Due to the COVID-19 pandemic, however, physical therapy appointments were no longer available.  ECF 26-3 at 8.

Severe claims the self-guided physical therapy he performed in lieu of working with a physical therapist was only supposed to be for three-weeks.  ECF 38 at 14.  Instead, the physical therapy was prolonged for eight months. *Id.*  He states he was told he had to complete physical therapy before he could be considered for a total hip replacement. *Id.* at 17.

On April 23, 2020, Severe complained of pain in his groin and it was determined that it "may be nerve irritation from the surgery."  ECF 26-3 at 8.  Crites contacted Matt Armentano, the chief physical therapist for the Bureau of Prisons ("BOP"), about Severe's inability to receive physical therapy due to pandemic restrictions. *Id.*  On June 25, 2020, Severe was given physical therapy exercises to perform on his own. *Id.*

On July 23, 2020, Severe reported that despite doing exercises on his own, he was still unable to walk normally.  ECF 26-3 at 8.  A repeat x-ray of his right hip on August 14, 2020 showed that the avascular necrosis had progressed. *Id.*; ECF 27 at 208.  A consultation with an orthopedist was requested on August 28, 2020, following an examination of Severe's right hip. ECF 26-3 at 8.

On October 16, 2020, Severe was advised that a consultation request for an orthopedist to consider him for a total hip replacement was pending.  ECF 26-3 at 8-9.  He was prescribed Meloxicam to treat the pain and inflammation.  *Id.* at 9.

Moubarek referred Severe for approval of total hip replacement on October 20, 2020.  ECF 26-3 at 9.  On November 6, 2020, the BOP Chief Physician denied the referral because Severe did not "have enough time left in BOP custody to get the surgery done and complete his rehabilitation before he is released."  *Id.*; ECF 27 at 237.  Under BOP Clinical Practice Guidelines for the Evaluation and Management of Osteoarthritis of the Hip and Knee inmates who have less than 18 months left on their sentence will usually not be considered for joint replacement procedures.  ECF 26-3 at 9; ECF 27 at 248-49 (BOP Clinical Practice Guideline).  Severe's release date by virtue of good conduct credit is March 3, 2022, or 15 months, 26 days from the date his total hip replacement surgery was denied.  ECF 26-2 at 5.

On December 14, 2020, BOP transferred Severe to a federal detention facility in Houston, Texas.  Severe advises that his transfer out of the Mid-Atlantic region was retaliatory in an effort to thwart this lawsuit and explains that his home is in Martinsburg, West Virginia, which is also where he was convicted and sentenced.  ECF 38 at 5, 14, *see also United States v. Severe*, Crim. Case 3:17-cr-00089-GMG-RWT-1 (D. N.D. W.Va. 2017).  Severe claims when he arrived in Texas, he was told by Dr. Petry it was a mistake to transfer him to a work cadre with clearance to work in a kitchen, given the condition of his hip.  ECF 38 at 5; 14.  He states that the Mid-Atlantic legal assistant, Howard Williams, wrote in his affidavit that Severe was sentenced in the Eastern District of California in 2013, which Severe characterizes as perjury.  *Id.* at 14, *see also* ECF 26-2 at 3, ¶ 4 (Williams affidavit); ECF 26-2 at 6 (showing court of jurisdiction: West Virginia, Northern District and date of offense: 02-12-2017).  BOP offers no explanation for Severe's

transfer to Texas.  Severe describes his trip to Texas as agonizing due to the condition of his hip.
ECF 38 at 14.

Severe summarizes his treatment while at FCI-Cumberland as consisting of being provided
a wheelchair for two days; being given pain medications 112 days out of 27 months (approximately
810 days); being denied the use of a cane until he had been complaining for seven months; and
being ignored despite his loss of 80 pounds in total from his inability to walk to receive meals.
ECF 38 at 14.  He further states that Moubarek denied him a pass for soft shoes even after an
orthopedist recommended them and that his hip replacement surgery, which he maintains was the
appropriate treatment for his hip, was delayed for 32 months until it was too close to his discharge
date.  *Id*.  He was not seen by an orthopedic doctor until one-year after his initial complaint on
September 11, 2018, following his fall from the top bunk.  *Id*. at 8, 11.

Despite the determination at FCI-Cumberland that Severe did not qualify for total hip
replacement surgery due to not having enough time left on his sentence, he was approved for the
surgery on April 19, 2021, less than a year from the date of his anticipated release.[4]  ECF 39 at 2.
Following his approval for the surgery, a meeting was held on April 30, 2021, between Severe, the
Clinical Director, Case Manager, and Unit Manager at the Houston Federal Detention Center to
discuss his qualification for Home Confinement under the Cares Act.  ECF 39-2 at 4.  The
memorandum of the meeting acknowledges that Severe was awaiting orthopedic surgery that
requires rehabilitation.  *Id*.  Severe told all who were present at the meeting that he wanted to
decline Home Confinement and pursue the surgery.  *Id*.  He was advised that if he remained eligible
under the Cares Act at the conclusion of his treatment plan, staff would submit him for Home

---

[4]     On August 23, 2021, this Court received correspondence from Severe indicating he had just returned from
having the total hip replacement procedure done.  ECF 43.

Confinement. *Id.* Otherwise, Severe would be submitted for Residential Re-Entry Center placement or Home Confinement under the guidelines of the Second Chance Act of 2007. *Id.*

## II.    Standard of Review

### A.

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom. McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 423 (2018); *Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Twombly*, 550 U.S. at 573; *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002) (stating that a complaint need only satisfy the "simplified pleading standard" of Rule 8(a)). But, the Supreme Court has explained that a "plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations omitted; alteration in *Twombly*).

Moreover, to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting *Twombly*, 550 U.S. at 570); *see Paradise Wire & Cable Defined Benefit Pension Fund Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not 'show[n]' -- 'that the pleader is entitled to relief.'" *Id*. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

Mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted); *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). Put another way, "an unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim for relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the

14

complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

A court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Soc'y Without a Name v. Comm'w of Va.*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Nonetheless, the complaint does not need "detailed factual allegations" to survive a motion to dismiss. *Twombly*, 550 U.S. at 555. Instead, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id*. at 563. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 11 (2014) (per curiam).

Courts generally do not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses" through a Rule 12(b)(6) motion. *Edwards*, 178 F.3d at 243 (quotation marks and citation omitted). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 533 F.3d 334, 336 (4th Cir. 2009); *see also U.S. ex rel. Oberg v. Penn. Higher Educ. Assistance*

*Agency*, 745 F.3d 131, 148 (4th Cir. 2014). However, because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear [ ] *on the face of the complaint*.'" *Goodman*, 494 F.3d at 464 (quoting *Forst*, 4 F.3d at 250) (emphasis in *Goodman*); *see Dean v. Pilgrim's Pride Corp.*, 395 F.3d 471, 474 (4th Cir. 2005).

In evaluating the sufficiency of a complaint in connection with a Rule 12(b)(6) motion, a court ordinarily "may not consider any documents that are outside of the complaint, or not expressly incorporated therein . . .." *Clatterbuck v. City of Charlottesville,* 708 F.3d 549, 557 (4th Cir. 2013); *see Bosiger v. U.S. Airways,* 510 F.3d 442, 450 (4th Cir. 2007). "Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). Under limited circumstances, however, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor and City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015).

A court may consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166; *see also* Fed. R. Civ. P. 10(c); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Paradise Wire & Cable*, 918 F.3d at 318. Notably, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the

16

plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 822 F.3d at 167. Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Goines*, 822 F.3d at 167. Therefore, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Id.* (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998)).

A court may also "consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, __U.S.__ , 138 S. Ct. 558 (2017); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014) (citation omitted); *Kensington Volunteer Fire Dep't. v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted)

(emphasis in original).  *See also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

Here, defendants argue that Severe's claims do not survive scrutiny under Rule 12(b)(6). Defendants provide the affidavits of Howard Williams (ECF 26-2), Mohamed Moubarek (ECF 26-3), Thomas Gera (ECF 26-4), Stacey Thompson (ECF 26-6), Wesley Whitaker (ECF 26-7), David Holler (ECF 26-8), Timothy Stewart (ECF 26-9), Michael Sample (ECF 26-10), and Kristi Crites (ECF 26-11), and copies of Severe's medical records (ECF 27) to support their position that he fails to state a claim under the Federal Tort Claims Act and fails to state a constitutional claim.  These documents are not intrinsic to Severe's complaint, however. Therefore, they may only be considered in the context of a motion for summary judgment.

## B.

As noted, the motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.  A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dept., Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss."  *Bosiger,* 510 F.3d at 450.  However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d).  If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. The City of Salisbury, Maryland*, 672 F. App'x 220, 222 (4th Cir. 2016) (per curiam). But, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside

18

the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

The Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice and a reasonable opportunity for discovery. *See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt.*, 721 F.3d 264, 281 (4th Cir. 2013). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. *See Moret v. Harvey*, 381 F. Supp. 2d 458, 464 (D. Md. 2005). Severe was provided such notice by the defendants. He also received notification from the Clerk of Defendants' dispositive filing and the opportunity to reply with exhibits and declarations. ECF 28.

Summary judgment is generally inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2011); *see Putney v. Likin*, 656 F. App'x 632, 638 (4th Cir. 2016) (per curiam); *McCray v. Maryland Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir. 2015). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)); *see also Dave & Buster's, Inc. v. White Flint Mall, LLLP*, 616 F. App'x 552, 561 (4th Cir. 2015).

To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for

specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)). "[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted).   A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports,* 914 F.3d 866, 874-75 (4th Cir. 2019); *Gordon v. CIGNA Corp.,* 890 F.3d 463, 479 (4th Cir. 2018); *Amirmokri v. Abraham,* 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x 274 (4th Cir. 2008), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods,* 302 F.3d at 244 (citations omitted). But, the nonmoving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature.   And, a court "should hesitate before denying a Rule 56(d) motion when the nonmovant seeks necessary information possessed only by the movant." *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014).

Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule

56(d) affidavit.  *Id.* (internal citations omitted).  According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'"  *Id.* at 244-45 (internal citations omitted); *see also Putney*, 656 F. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008).  "This is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 F. App'x at 638.

Severe has not filed an affidavit under Rule 56(d) but includes proposed interrogatories with his opposition response.  ECF 38 at 3.  Defendants have provided Severe with a detailed accounting of events and the timeline relevant to his claims through the documents filed in support of their motion and Severe has obtained his medical records through his own efforts.  While the court is satisfied that it is appropriate to address defendants' motion as one for summary judgment, discovery following the appointment of counsel to represent Severe shall also be required.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020); *Variety Stores, Inc. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017).  To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law.  *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (emphasis in original).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id*. at 248.  There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.; *see CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020); *Variety Stores, Inc.*, 888 F.3d at 659; *Sharif v. United Airlines, Inc.,* 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004).  And, the court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med*. *Ctr., Inc*., 290 F.3d 639, 645 (4th Cir. 2002); *see Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Roland v. United States Citizenship & Immigration Servs*., 850 F.3d 625, 628 (4th Cir. 2017); *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

Notably, the district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S.

at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, the trial court may not make credibility determinations on summary judgment. *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility.  That said, "a party's 'self-serving opinion ... cannot, absent objective corroboration, defeat summary judgment.'" *CTB, Inc.*, 954 F.3d at 658-59 (quoting *Williams v. Giant Food Inc.,* 370 F.3d 423, 433 (4th Cir. 2004)). In other words, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co*., 818 F.2d 1126, 1128 (4th Cir. 1987); *Harris v. Home Sales Co*., 499 F. App'x 285, 294 (4th Cir. 2012).

Because Severe is self-represented, his submissions are liberally construed.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

In sum, to counter a motion for summary judgment, there must be a genuine dispute as to material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 585–86 (1986). "A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law." *Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017).

### III.    Discussion

### A.    Public Health Service Officers

Defendants first assert that at the time of the relevant events, Crites was a commissioned officer of the United States Public Health Service ("PHS") and is immune from suit under *Bivens* for an Eighth Amendment claim.  By statute, commissioned officers and employees of PHS are immune from liability for damages "resulting from the performance of medical . . . functions."  42 U.S.C. § 233(a) (2018).  This provision "precludes *Bivens* actions against individual PHS officers or employees" for harm arising from the performance of their duties.  *Hui v. Castaneda,* 559 U.S. 799, 812 (2010).  The sole remedy provided for persons injured by PHS commissioned officers is through the FTCA.  Thus, the Eighth Amendment *Bivens* claim against Crites will be dismissed.

### B.    Personal Participation

Severe names Timothy Stewart and Assistant Warden Sample as defendants; however, he does not allege, nor is there evidence to establish, that either of these defendants participated in the alleged delay in providing him with appropriate medical care.  "In a Bivens suit, there is no *respondeat superior* liability.  Instead, liability is personal, based upon each defendant's own constitutional violations." *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (citation omitted). This is because the purpose of a *Bivens* claim is to deter the actions of the officer.  *See F.D.I.C. v. Meyer*, 510 U.S. 471, 485 (1994).  A plaintiff making a supervisory liability claim must therefore show "that the supervisor had actual or constructive knowledge that [the] subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff," "that the supervisor's response showed deliberate indifference to or tacit authorization of the alleged offensive practices," and that there was a causal link between the supervisor's inaction and the plaintiff's injury.  *See Wilkins v. Montgomery*, 751 F.3d 214, 226-27 (4th Cir. 2014) (discussing supervisory liability under 42 U.S.C. § 1983).  Given that there is no discernible

24

basis for holding either Stewart or Sample liable for a *Bivens* claim grounded on an Eighth Amendment violation regarding medical care, the complaint against them shall be dismissed.

### C.     *Bivens* Claims

Severe asserts two constitutional claims pursuant to *Bivens*.  He raises a claim that his Eighth Amendment right to be free from cruel and unusual punishment was violated when defendants Moubarek and Crites[5] did not address the serious condition of his hip and when defendant Holler failed to provide him with a cell that had a ladder to the top bunk.

The Supreme Court has clarified over the years that "a *Bivens* remedy will not be available if there are 'special factors counseling hesitation in the absence of affirmative action by Congress.'"  *Ziglar v. Abbasi*, 582 U.S. __, __, 137 S.Ct. 1843, 1857 (2017) (quoting *Carlson v. Green*, 446 U.S. 14, 18 (1980)).  An Eighth Amendment claim of deliberate indifference to a serious medical need may be pursued through a *Bivens* claim.  *See Carlson*, 446 U.S. at 18-19, *see also Earle v. Shreves*, 990 F.3d 774, 776 (4th Cir. 2021) (*Bivens* may not be extended to include a federal inmate's claim that prison officials violated his First Amendment rights through retaliatory actions).[6]  Defendants argue that Severe's claim that the policy of not providing ladders in cells at FCI Cumberland is an impermissible extension of *Bivens* under *Abbasi*.  ECF 26-1 at 26-30.  This court is inclined to agree that the *Bivens* ladder claim is not cognizable for the following reasons.

"[T]he question of whether to provide a *Bivens* remedy should be informed and limited by separation-of-powers principles."  *Tun-Cos v. Perrotte*, 922 F.3d 514, 522 (4th Cir. 2019).  The *Abbasi* Court formulated a two-step inquiry for determining if a *Bivens* remedy is available, requiring that courts first look to whether "the statutory or other legal mandate under which the

---

[5]     As already noted, Crites is immune from a *Bivens* claim regarding medical care.

[6]     To the extent that Severe implies a retaliation claim with respect to his transfer to Houston, it is not a cognizable claim under *Bivens*.

officer[s] were operating" differs "'in [any] meaningful way' from the three cases[7] in which the Court has recognized a *Bivens* remedy." *Id*. at 523, quoting *Abbasi*, 137 S.Ct. at 1859.  If there is no meaningful contextual difference, then a *Bivens* remedy remains available.  *Id*.  If the context is new, however, this court is required to consider whether there are "special factors counseling hesitation in the absence of affirmative action by Congress." *Abbasi*, 137 S.Ct. at 1857.  In other words, the inquiry is *who* should decide that a damages remedy should exist – the legislative branch or the judiciary.  *Id*.  Importantly the Supreme Court has "consistently refused to extend *Bivens* to any new context or new category of defendants." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001).

In Severe's claim against Unit Manager Holler, he asserts in part that his Eighth Amendment rights were violated through implementation of an "unsound policy, ordinance, regulation or unconstitutional custom or practice of not installing ladders in FCI Cumberland prison cells."  ECF 1 at 17.  Contextually, Holler does not differ from the category of defendants who were sued in *Carlson* where a *Bivens* remedy has been recognized.  However, the claim itself attacks a policy, *i.e.,* whether to put ladders in cells at FCI Cumberland, and such a claim has not been recognized as one meriting a remedy under *Bivens*.  In fact, there is precedent leading to the opposite conclusion: that changing or challenging a federal policy is not an acceptable goal of a *Bivens* claim.  *See Meyer*, 510 U.S. at 485 (*Bivens* remedy designed to deter individual officers' acts), *see also Malesko*, 534 U.S. at 74 (*Bivens* was "never considered a proper vehicle for altering

---

[7]     The three cases referenced by the *Abbasi* Court are: *Bivens*, 403 U.S. 388, 389-98 (1971)(remedy available for Fourth Amendment claim against federal agents after they handcuffed a man in his own home without a warrant), *Davis v. Passman*, 442 U.S. 228, 248-49 (1979) (recognizing *Bivens* remedy in suit against a Congressman by former employee who claimed sex discrimination in violation of the equal protection clause of the Fifth Amendment) and *Carlson v. Green*, 446 U.S. 14, 19 (1980) (recognizing damages remedy under *Bivens* for Eighth Amendment violation by federal jailers when they refused to treat a prisoner-plaintiff's asthma).

an entity's policy"), *Tun-Cos*, 922 F.3d at 527 (same).  Accordingly, Severe's *Bivens* claim against

Holler must be dismissed because it is not cognizable.

The Eighth Amendment claim against Moubarek is, however, a cognizable *Bivens* claim.

*See Carlson*, 446 U.S. at 19.  To state a claim for denial of medical care, a plaintiff must

demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate

indifference to a serious medical need.  *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also*

*Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017).

Deliberate indifference to a serious medical need requires proof that, objectively, the

prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff

were aware of the need for medical attention but failed to either provide it or ensure it was

available.  *See Farmer v. Brennan*, 511 U.S. 825, 834-37 (1994); *see also Heyer v. U.S. Bureau of*

*Prisons*, 849 F.3d 202, 209-10 (4th Cir. 2017); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir.

2016); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).  Objectively, the medical condition at

issue must be serious.  *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that

prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d

170, 178 (4th Cir. 2014).  "A 'serious medical need' is 'one that has been diagnosed by a physician

as mandating treatment or one that is so obvious that even a lay person would easily recognize the

necessity for a doctor's attention.'"  *Heyer*, 849 F.3d at 210 (quoting *Iko*, 535 F.3d at 241); *see*

*also Scinto v. Stansberry*, 841 F.3d 219, 228 (4th Cir. 2016) (failure to provide diabetic inmate

with insulin where physician acknowledged it was required is evidence of objectively serious

medical need).

After a serious medical need is established, a successful claim requires proof that the

defendants were subjectively reckless in treating or failing to treat the serious medical condition.

*See Farmer*, 511 U.S. at 839-40.  "Actual knowledge or awareness on the part of the alleged

27

inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842). While "a prisoner does not enjoy a constitutional right to the treatment of his or her choice, the treatment a prison facility does provide must nevertheless be adequate to address the prisoner's serious medical need." *De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013).

It is beyond dispute that Severe was suffering from a serious medical condition which caused him acute pain, making it so difficult to walk that he lost 80 pounds due to his inability to walk the distance to the prison chow hall. Severe consistently complained about the worsening pain in his right leg and by the time a second x-ray was performed on February 13, 2019, at least a suspicion of avascular necrosis in his hip was established. Yet, the health providers did not prescribe a prescription anti-inflammatory until April 29, 2019 and did not provide a cane until that same date, despite the February treatment plan including a cane. In April of 2019, Hahn informed Moubarek that the condition of Severe's hip was such that steroid injections would not help and that he needed a hip replacement. Two months later, x-ray again confirmed avascular necrosis. Still, another two months passed before Severe received an MRI confirming bilateral avascular necrosis with the right hip worse than the left. It was not until February 10, 2020 that Severe received decompression surgery which, according to Severe, had only a 60% chance of alleviating the condition.

More notable is the delay between Severe's February 10, 2020 decompression surgery and the date Moubarek submitted a request for total hip replacement. Notwithstanding Dr. Berkenblit's instruction that Severe should return in three weeks for a total hip replacement if there was no improvement after the decompression surgery, nothing happened until June 25, 2020, when Severe was given physical therapy exercises. ECF 26-3 at 8. It was not until October 20, 2020, that Moubarek finally referred Severe for consideration of a hip replacement. *Id.* at 9.

While Moubarek claims that Severe was treated for the pain in his hip through repeated x-rays and consultations with orthopedists, Severe asserts that the refusal to provide him with pain relief despite his constant complaints that he could no longer walk without pain and the insistence on repeating x-rays to confirm what had already been established, were merely delay tactics. Thus, the intentions behind the delays and the rationale for ignoring the advice of specialists are genuine disputes of material fact that preclude summary judgment in Moubarek's favor on the *Bivens* claim. The motion is denied as to Severe's Eighth Amendment claim against Moubarek.

**D.      Federal Tort Claims Act**

The Federal Tort Claims Act ("FTCA") is a limited waiver of the sovereign immunity of the United States with respect to certain types of tort actions. 28 U.S.C. § 1346. Under the FTCA, the United States is liable, as a private person, for "injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." *Id.* § 1346(b)(1). As a waiver of sovereign immunity, the FTCA is to be narrowly construed and is not to be extended by implication. *See United States v. Nordic Vill., Inc.*, 503 U.S. 30, 33-34 (1992); *see also Kokotis v. U.S. Postal Serv.*, 223 F.3d 275, 278 (4th Cir. 2000) ("[T]he circumstances of [the] waiver must be scrupulously observed and not expanded by the courts."); *Gould v. U.S. Dep't of Health & Human Servs.*, 905 F.2d 738, 741 (4th Cir.1990); *Quigley v. United States*, 927 F. Supp. 2d 213

(D. Md. 2012).  Because the sovereign's consent to waiver of its immunity is to be narrowly construed, actions brought under the FTCA must be filed in exact compliance with its terms.  *See Kokotis*, 223 F.3d at 278 ("[P]laintiffs . . . must file an FTCA action in careful compliance with its terms."); *Gould*, 905 F.2d at 741 ("This waiver permits suit only on terms and conditions strictly prescribed by Congress.").  To proceed under the FTCA, a claimant cannot file a lawsuit unless he/she has first presented an administrative claim to the appropriate federal agency and it has been finally denied or the agency has not made a final determination after the passage of six months. 28 U.S.C. § 2675(a).  Compliance with the administrative claim process within two years of the incident is a jurisdictional prerequisite to suit under the FTCA.  *Kokotis*, 223 F.3d at 278.

### 1.      Medical Malpractice

Defendants assert that Severe's medical claims alleging negligence or malpractice are subject to dismissal because he did not comply with the Maryland Health Care Malpractice Claims Act.  *See* Md. Code Ann., Cts. & Jud. Proc. § 3-2A-02 *et seq*.  The short answer to this assertion is that defendants are mistaken.  In its opinion dated July 21, 2021, the Fourth Circuit held that a prisoner suing for medical malpractice under the FTCA and *Bivens* was not required to comply with West Virginia's requirement that medical malpractice plaintiffs obtain a "screening certificate of merit" prior to filing suit.  *Pledger v. Lynch*, 5 F.4th 511, 518 (4th Cir. 2021).  The Court noted that "West Virginia is not alone in imposing such a pre-suit certification requirement.  About half of all states similarly demand that medical malpractice plaintiffs secure some sort of early support from a qualifying expert."  *Id*.  In light of what the Court characterized as a "growing consensus that certificate requirements like West Virginia's do not govern actions in federal court because they conflict with and are thus supplanted by the Federal Rules of Civil Procedure," the Fourth Circuit held that failure to comply with such pre-suit certification requirements is not grounds for dismissal of a complaint filed pursuant to the FTCA.  *Id*.  The Maryland Health Care Malpractice

Claims Act is such a pre-suit certification and cannot serve as grounds for dismissing Severe's FTCA claim.

Defendants also assert that Severe has failed to state a plausible claim of medical malpractice, entitling them to dismissal of the claim pursuant to Fed. R. Civ. P. 12(b)(6).  They again argue that Severe has not provided an expert opinion stating that the care provided to him fell below an accepted standard of care.  However, in the context of a motion to dismiss, Severe's allegations are presumed true and any failure to provide independent expert analysis of his claim is not required.  As the Fourth Circuit observed in *Pledger*, "Rule 12 is . . . 'sufficiently broad' to control a question that [a pre-filing certification requirement] . . . seeks to answer: what defects in a complaint mandate dismissal." *Pledger*, 5 F.4th at 520, quoting *Burlington N.R.R.Co. v. Woods*, 480 U.S. 1, 4-5 (1987).  Further, "[p]laintiffs need not gather any expert evidence or serve it on defendants 'for a claim to be plausible.'" *Pledger*, 5 F.4th at 520, quoting *Gallivan v. United States*, 943 F.3d 291, 293 (6th Cir. 2019).

Turning to the plausibility of Severe's claim, this court finds that he has stated a claim sufficient to survive a motion to dismiss or for summary judgment.  Severe has alleged that most of the actions taken by Moubarek and Crites amounted to simply delaying the inevitable, appropriate treatment: total hip replacement surgery, despite knowing the rapidly deteriorating state of his hip joint and their first-hand observation of his pain and discomfort.  As early as April 29, 2019, when Moubarek consulted Hahn, it was clear that Severe's avascular necrosis had progressed beyond that which could be addressed with a cane and over the counter pain relievers.  Indeed, Hahn advised Moubarek that the necrosis was too far advanced to be addressed with steroid injections and that Severe needed hip replacement surgery.  Notwithstanding this advice, Severe was not provided anything beyond imaging and attempts at palliative care until he received decompression surgery on February 10, 2020, ten months after Hahn first advised that hip

replacement surgery should be considered.  The decompression surgery was unsuccessful, but rather than attempting to accommodate Severe with hip replacement surgery, Severe was simply transferred to a location far from the area where Severe lived prior to his incarceration. Defendants' motion to dismiss or for summary judgment on the FTCA medical claims is therefore denied.

### 2.    Failure to provide ladder

Severe's claim that it was negligent not to provide ladders in all cells at FCI-Cumberland to enable inmates to reach the upper bunk does not fare as well.  The waiver of sovereign immunity provided by the FTCA is subject to exceptions, and one exception exists for the performance of discretionary functions.  This exception immunizes the Government from "[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." *Sanders v. United States*, 937 F.3d 316, 327 (4th Cir. 2019) *see also* 28 U.S.C. § 2680(a).

A two-part test applies to determine if the discretionary function exception bars a particular claim.  *Wood v. United States*, 845 F.3d 123, 128 (4th Cir. 2017).  "First, a court must determine whether the conduct in question 'involves an element of judgment of choice.'"  *Id*. quoting *Berkovitz ex rel. Berkovitz v. United States*, 486 U.S. 531, 536 (1988).  "Second, when the challenged conduct is the product of judgment or choice, the court must still determine whether the decision made was 'based on considerations of public policy.'"  *Wood* 845 F. 3d at 128 quoting *Berkovitz*, 486 U.S. at 536.  "[W]hen established government policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion."  *United States v. Gaubert*, 499 U.S. 315, 324 (1991).

"The Bureau of Prisons, under the direction of the Attorney General," is required to: "provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons convicted of offenses against the United States . . . [and] provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States."  18 U.S.C. § 4042(a)(2) & (3).  This statutory provision provides only a general framework within which Bureau of Prisons employees must run the facilities where convicted federal prisoners are held.  Decisions such as housing and cellmate assignments have been found to fall within the discretionary function exception foreclosing civil liability against the United States for those decisions.  *See Rinaldi v. United States*, 904 F.3d 257, 273-4 (3rd Cir. 2018), *Montez ex rel. Estate Hearlson v. United States*. 359 F.3d 392, 396-98 (6th Cir. 2004), *Santana-Rosa v. United States*, 335 F.3d 39, 43-44 (1st Cir. 2003), *Cohen v. United States*, 151 F.3d 1338, 1342 (11th Cir. 1998), *Dykstra v. U.S. Bureau of Prisons*, 140 F.3d 791, 795-96 (8th Cir. 1998), *Calderon v. United States*, 123 F.3d 947, 948-50 (7th Cir. 1997).  The decision whether to provide ladders for access to upper bunks has also been found to fit within the discretionary function exception.  *See Bultema v. United States*, 359 F.3d 379, 384 (6th Cir. 2004) (finding policy of not providing ladders or guardrails based on security concern a discretionary function insulated from FTCA liability); *Alvarado-David v. United States*, 972 F.Supp.2d 210, 216 (D. Puerto Rico 2013) (same); *Preston v. United States*, 2010 WL 297563, *3 (N.D. Ga. 2010) (citing *Bultema*), *Harris v. United States*, 2006 WL 2583435, *6 (W.D. W.Va. 2006).

A finding that the decision whether to place ladders in prison cells is discretionary is also supported by well-established Supreme Court decisions cautioning courts that prison officials are to be accorded deference in matters better left to their expertise such as security issues.  *See Sandin v. Conner*, 515 U.S. 472, 482-83 (1995) (it is not the province of the courts to determine how prisons might be more beneficently run).  "Prison administrators . . . should be accorded wide-

ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Whitley v. Albers,* 475 U.S. 312, 321–2 (1986).

Whether this Court, or Severe, agrees with the rationale behind declining ladders to inmates in federal custody so they might more safely reach the top bunk is of no consequence.  Where, as here, the discretionary function test applies to a decision made by federal defendants, the claim is prohibited and must be dismissed.

## E.    Qualified Immunity

Moubarek asserts a qualified immunity defense in connection with the constitutional claims leveled against him.   ECF 26-1 a 38.   The defense is unavailing both because the Eighth Amendment right to treatment for a serious medical need has been clearly established for decades, *see Dist. of Columbia v. Wesby*, _ U.S. _, 138 S. Ct. 577, 589 (2018) (defining "clearly established") and because there exists a material dispute of fact regarding whether the conduct allegedly violative of plaintiff's constitutional right actually occurred, *see Willingham v. Crooke*, 412 F.3d 553, 559 (4th Cir. 2005).  While it is true that qualified immunity is ordinarily determined at the summary judgment stage of litigation, *see Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003), the defense of "[q]ualified immunity does not, however, override the ordinary rules applicable to summary judgment proceedings."  *Willingham*, 412 F.3d at 559, citing *Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir. 1992).

### IV.    Conclusion

Based on the foregoing rationale, defendants' motion to dismiss or for summary judgment is granted as to the *Bivens* claim against defendant Kristi Crites, all claims raised against defendants Holler, Stewart and Sample, and the FTCA regarding provision of ladders; the motion is denied as to the *Bivens* claim against defendant Moubarek and the FTCA claim against the

United States based on the alleged medical malpractice by Moubarek and Crites. Severe's motions to appoint counsel shall be granted and this case shall be stayed pending his return to his home in the Mid-Atlantic area. The complaint as to defendants Yoon, Khorashad, and Hahn shall be dismissed without prejudice, as counsel represented to the court that these parties are not federal employees. ECF 26-1 at 5, n.1.

A separate order follows.

October 1, 2021                                  /s/
Date                                 Stephanie A. Gallagher
                                     United States District Judge